Miller & Long, Inc. v. Intracoastal Living, LLC, 2011 NCBC 16.

STATE OF NORTH CAROLINA

COUNTY OF BRUNSWICK

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
07 CVS 1760

MILLER & LONG, INC.,                        )
                        Plaintiff           )
                                            )
          v.                                )          **ORDER ON MOTION TO STAY**
                                            )          **AND COMPEL ARBITRATION**
INTRACOASTAL LIVING, LLC, SUPERIOR           )
CONSTRUCTION CORPORATION,                    )
WESTERN SURETY, ET AL.,                      )
                        Defendants          )

THIS CAUSE, designated an exceptional case by Order of the Chief Justice of the North Carolina Supreme Court, pursuant to Rule 2.1 of the General Rules of Practice for the Superior and District Courts, and assigned to the undersigned Chief Special Superior Court Judge for Complex Business Cases, comes before the court upon Defendants Superior Construction Corporation's ("Superior" or "Contractor") and Western Surety Company's ("Western") (collectively, "Movants") Motion to Stay and Compel Arbitration of Claims (the "Motion"). Superior has requested that the court issue an order staying the relevant claims and compelling Plaintiff to proceed with arbitration under the terms of the contracts between the parties.

After considering the arguments of counsel and all appropriate matters of record, the court FINDS:

[1]     On January 21, 2005, Superior entered into a written contract with Intracoastal Living, LLC ("Intracoastal" or "Owner"), the owner of The Preserve Project (the "Project"), for the construction of Buildings Two and Three and the Clubhouse of

the Project.[1]  Superior subsequently entered into contracts with Intracoastal for the construction of Buildings Four and Five of the Project.[2]

[2]     On or before April 11, 2005,[3] Superior, as general contractor, entered into a written subcontract agreement with Miller and Long, Inc. ("Miller & Long"), pursuant to which Miller & Long was to furnish and install "all concrete, post-tensioning materials and accessories, reinforcing steel and accessories, and the placement of all other sub trade embeds required to construct these concrete frame buildings from the stone columns (by others) up through and including the roofs" in connection with the construction of Buildings Two and Three of the Project (the "Buildings Two and Three Subcontract").[4]  This subcontract is identified with the number 04MBD006-S01 and is in the amount of $5,825,000.[5]  It was signed by both Miller & Long and Superior.[6]

[3]     On October 14, 2005, Superior sent Miller & Long a Letter of Intent regarding a subcontract for Building Four (the "Building Four Subcontract") in the amount of $1,860,000 for concrete foundations, columns, slab and elevated post-tensioned decks.[7]  In compliance with this letter, Miller & Long obtained a certificate of insurance, dated October 18, 2005, which identifies Miller & Long as the insured party, Superior as an additional insured party, the covered operation as Building Four and

---

[1] *See* 2d Am. Compl. ¶ 44, *Superior Constr. Corp. v. Intracoastal Living, LLC,* Brunswick Co., 07 CVS 2806.
[2] *Id.* ¶ 61, citing a date of October 14, 2005.  *But see* Br. Supp. Mot. Stay Comp. Arb. Section I (A), suggesting the January contract also included work for Building Four.  The AIA contract for Building Four suggests a date of October 14, 2005, consistent with the 2d Am. Compl. ¶ 61.  *See* Rep. Br. Supp. Mot. Stay Comp. Arb. Ex. B.
[3] *See* Compl. ¶ 16 and Am. Compl. ¶ 46; *but see* Clardy Aff., Ex. A, Building Two and Three Subcontract, dated March 6, 2005.
[4] Clardy Aff. Ex. A.
[5] *Id.*
[6] *Id.*
[7] May 22, 2008 Dickman Aff. Ex. A.

Superior as the certificate holder.[8]  Miller & Long has secured payment and performance bonds, both dated October 13, 2005, and in the amount of $1,860,000 for Building Four.[9]  On these bonds, Miller & Long is named as the contractor, and Superior is named as the owner.[10]

[4]     A document purporting to be the Building Four Subcontract, dated October 13, 2005,[11] was generated by Superior, but was never signed by the parties.[12]  The subcontract number associated with this agreement is 05MBD014-S01.[13]

[5]     Miller & Long submitted Application for Payment forms that reflect the original contract sum of $1,860,000 and which reference Building Four.[14]  These forms state:

> The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

These Application for Payment forms are signed by Plaintiff.

[6]     When relevant, the Buildings Two and Three Subcontract and the Building Four Subcontract are collectively referred to herein as the "Subcontract(s)."

---

[8] *Id.* Ex. B.
[9] *Id.* Exs. C, D, respectively.
[10] *Id.*
[11] *Id.* Ex. F. The court notes the cover page of Ex. F describes the project as "7th Avenue South Condominiums, Bali Bay," with a contracted amount of $587,000 and a subcontract number of 05MBD005-S01.  Further internal pages, however, describe the project as one for Building Four, a contracted amount of $1,860,000 and a subcontract number of 05 MBD014-S01.  The court concludes the title page affixed to Ex. F was erroneously included in the exhibit.
[12] *Id.  See also* Compl. ¶ 25.
[13] Dickman Aff. Ex. F, sub-exhibit A.
[14] *Id.* Ex. E.

[7]     Article 14 of the Buildings Two and Three Subcontract is identical to that of the Building Four Subcontract, excepting one revision in the first subcontract regarding the stated location of arbitration proceedings.[15]

[8]     Paragraph 14.1[16] of each Subcontract provides:

> AGREEMENT TO ARBITRATE.  All claims, disputes and matters in question arising out of, or relating to, this Agreement or the breach thereof, except for claims which have been waived by the making or acceptance of final payment, and the claims described in Article 14.7, shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then *in* effect unless the parties mutually agree otherwise. This agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law.  (emphasis in original.)

[9]     Miller & Long sent Superior a bid proposal for Building Five, dated April 20, 2006,[17] and a request for a letter of intent, dated May 9, 2006.[18]  The bid proposal included a bid amount of $3,503,000 and expressly "assumes that the Inclusions, Exclusions and Qualifications noted on the Bid Proposals for Buildings 2 and 3 . . . are applicable to [Miller & Long]'s scope of work unless noted otherwise within this proposal."[19]  An attachment to Miller & Long's request for a letter of intent also indicated a total contract amount of $3,503,000.[20]  Superior replied with at least two letters of intent, dated May 11 and May 23, 2006, respectively, advising Miller & Long of Superior's intent to issue Miller & Long a subcontract in the amount of $3,503,000 for

---

[15] *Cf.* Clardy Aff. Ex. A (Buildings Two and Three Subcontract) and Dickman Aff. Ex. F (Building Four Subcontract).

[16] Article 14 specifically addresses the topic of arbitration.  The provisions therein are hereinafter referred to as the "arbitration provisions."

[17] July 2, 2008 Dickman Aff. Ex. J.

[18] *Id.* Ex. K.

[19] *Id.* Ex. J.

[20] *Id.* Ex. K ("Schedule of Values").  Defendant argues that Miller & Long submitted this Schedule of Values in accordance with § 16.2 of Superior's standard written subcontract.  *See* Br. Supp. Mot. Stay Comp. Arb. Section II (E).

concrete framing and foundations for Building Five.[21]  Superior instructed Miller & Long to consider these letters of intent as formal "Notice[s] to Proceed."[22]  Notwithstanding these documents (collectively, the "Building Five Agreement"), there is no written, signed agreement purporting to be a contract between the parties for work on Building Five.

[10]    Miller & Long submitted at least eight Application for Payment forms, all of which reference Building Five and reflect the original contract sum of $3,503,000.[23] Like the forms for Building Four, these forms are signed by Miller & Long and include certification language that explicitly references "the Contract Documents." [24] Handwritten notes on the forms suggest numbers associated with the project.  Five of the forms include a notation of 07MBD020; another five include a notation of 03-101, and another five include a notation of S-01.[25]  Statements provided by Miller & Long for costs associated with Building Five include an identification number of 1-6530.[26]  The numbers 07MBD020-S01 and 1-6530 are typed and handwritten, respectively, on a copy and receipt of a check written by Superior and made out to Miller & Long in the amount of $1,551,615.30 for work completed on Building Five, the total billed in the first four applications.  A receipt for another check written by Superior and made out to Miller

---

[21] July 2, 2008 Dickman Aff. Ex. L.
[22] *Id.*
[23] *See*, *e.g.*, *Id.* Ex. M.  Superior mentions that Miller & Long submitted these applications on standard AIA forms, just as it had with respect to the Subcontracts and as required by Superior's Subcontracts. *See* Br. Supp. Mot. Stay Comp. Arb. Section II (E).
[24] July 2, 2008 Dickman Aff. Ex. M.
[25] *Id.*  The court notes that an "S-01" identification marker was also used to reference the Building Four Subcontract.
[26] *Id.*

& Long in the amount of $167,122.80 also includes the identification numbers 07MBD020-S01 and 1-6530.[27]

[11]    At times material, Miller & Long undertook to perform pursuant to the Subcontracts and the Building Five Agreement.  During the course of the work, disputes developed between Superior and Miller & Long arising out of their respective contractual obligations.

[12]    On August 13, 2007, Miller & Long filed a suit against Intracoastal, Superior, Western and Preserve Holdings, LLC regarding claims and disputes arising out of or relating to the Subcontracts and the Project.[28]  The Complaint was verified by Joseph J. Burns ("Burns"), Miller & Long's Vice President, on August 9, 2007.  In its Complaint, Miller & Long requests a jury trial on all issues of fact.[29]

DISCUSSION

[13]    Movants, claiming that Miller & Long's filing of this civil action is in violation of the terms of the Subcontracts, seek an order directing Miller & Long to proceed to arbitration pursuant to N.C. Gen. Stat. § 1-569.1 (hereinafter, references to the North Carolina General Statutes will be "G.S.") and staying any further proceedings in this action for claims subject to the arbitration provision.

[14]    In substance, Miller & Long responds that (a) there is no agreement to arbitrate with respect to the claims on Buildings Four and Five and that the conditions to arbitrate in the Buildings Two and Three Subcontract, as well as the Building Four Subcontract, have not been met and (b) Superior should be estopped from asserting

---

[27] *Id.* Ex. M.  This amount is very close (within $2) to the amount due per Miller & Long's seventh application for payment.
[28] Miller & Long subsequently dismissed Western as a party to that suit.
[29] Compl. ¶ 7.

different positions on Miller & Long's work and entitlement to payment, as well as the general arbitrability of Miller & Long's claims on Building Five.[30]

[15]   In North Carolina, arbitration clauses are governed by the North Carolina Arbitration Act, G.S. 1-569.1 *et seq.*  G.S. 1-569.6, specifically, defines the parameters of which disputes should be referred to arbitration:

> Validity of agreement to arbitrate. (a)   An agreement contained in a record to submit to arbitration any existing or subsequent controversy arising between the parties to the agreement is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for revoking a contract. (b)  The court shall decide whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate.

[16]   North Carolina has a strong public policy in favor of arbitration and will resolve disputes regarding the scope of arbitrable issues in favor of arbitration. *Carteret County v. United Contractors*, 120 N.C. App. 336, 342 (1995) (citing *Cyclone Roofing Co. v. David M. La Fave Co.*, 312 N.C. 224, 229 (1984)).

[17]   In addition to North Carolina law, Movants correctly point to the Federal Arbitration Act ("FAA"), 9 U.S.C.S. § 1 *et seq.*, as applicable to this dispute.  Under the FAA, a written provision in a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of the contract or transaction is deemed to be valid, irrevocable and enforceable unless such grounds exist at law or in equity for the revocation of the contract.  9 U.S.C.S. § 2.  Here, the Movants were involved in "commerce" as defined by the FAA, and the Act requires a stay while the arbitration dispute is pending.

[18]   However, the FAA also provides that if there is a question as to:

---

[30] Pl. Br. Resp. Opp. Mot. Stay 7.  *See also* Pl. Rep. Br. Supp. Mot. Partial Summ. J. 8-9.

the making of the arbitration agreement or the failure, neglect, or refusal to perform the same . . . the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure [USCS Rules of Civil Procedure], or may specially call a jury for that purpose.

9 U.S.C.S. § 4.

[19] A "party challenging [an] arbitration provision must create a genuine issue of fact by presenting 'enough evidence to make the denial colorable.'" *Lawrence v. Household Bank, N.A.*, 343 F. Supp. 2d. 1101, 1111 (M.D. Ala. 2004) (quoting *Chastain v. The Robinson-Humphrey Co.*, 957 F.2d 851, 854 (11th Cir. 1992)); *See also Battels v. Sears Nat'l Bank*, 365 F. Supp. 2d. 1205, 1215-16 (M.D. Ala. 2005) ("Plaintiffs' motion for a jury trial is due to be denied because they have not created a genuine issue of fact as to whether arbitration agreements were reached between themselves and Defendant.").

<u>Existence of Agreements to Arbitrate Claims</u>

[20] Notwithstanding Miller & Long's demand for a jury trial, Miller & Long seeks payment for performance of the work done pursuant to the terms of the respective Subcontracts, while at the same time seeking to deny the enforceability of one of the terms of the Subcontracts. Much like the case of *Real Color Displays, Inc. v. Universal Applied Techs.*, 950 F. Supp. 714 (E.D.N.C. 1997), Miller & Long's conduct demonstrates that it intended to be bound by the Subcontracts, including the Arbitration

Clause. Indeed, the subsequent writings signed by Miller & Long specifically relate back to and incorporate the terms of the respective Subcontracts.

## Building Four

[21] While the Building Four Subcontract was never signed, the fact remains that Miller & Long undertook to perform the contract in accordance with the terms of the Building Four Subcontract. The facts and circumstances of the dealings between the parties clearly demonstrate that the Building Four Subcontract was intended by the parties to be binding. The fact that this subcontract was not signed does not change this result. Therefore, Miller & Long has not presented a genuine issue of material fact as to the existence of an agreement to arbitrate disputes with respect to its claims on Building Four. As such, it is not entitled to a determination of this matter by a jury.

## Building Five

[22] There is no written contract pursuant to which Miller & Long performed its work on Building Five. The court recognizes, however, that the bid, letters of intent, work performed and bills submitted demonstrate the existence of a contract between Miller & Long and Superior. *See, e.g.*, *Industrial & Textile Piping, Inc. v. Industrial Rigging Servs., Inc.*, 69 N.C. App. 511, 514 (1984) ("[t]he parties' failure to reach agreement on the written subcontract does not preclude the conclusion that an express contract existed."). It is also true that the parties' intent, where not clear from their contract, may be inferred from the parties' actions. *Branch Banking & Trust Co. v. Kenyon Inv. Corp.*, 76 N.C. App. 1, 9 (1985).

[23] Movants argue that (a) the parties' conduct and the other writings exchanged by the parties demonstrate their intent to be bound by the same terms of the

Subcontracts; (b) the facts and evidence show that the terms of the contract for Building Five were the same as those for Buildings Two, Three and Four and (c) principles of judicial economy support staying the action and compelling arbitration of all of Miller & Long's claims.

[24]    The court is sympathetic to Movants' arguments but ultimately determines that it cannot compel arbitration with respect to the Building Five Agreement.  An unwritten contract, notwithstanding inferred intent based on the parties' actions, does not fulfill the writing requirement of G.S. 1-569.6(a).  To extend the scope of the Arbitration Clause to include the Building Five Agreement would stretch too thinly the statutory requirement for a written agreement.  As such, the court cannot force the parties to submit to arbitration with respect to the Building Five Agreement.

<u>Conditions to Arbitrate: Buildings Two, Three and Four</u>[31]

[25]    Article 14.2 of each Subcontract states, in part:

> Notice of demand for arbitration shall be filed in writing with the other party to this agreement and with the American Arbitration Association.  Tile [sic] demand for arbitration shall be made within a reasonable amount of time after written notice of the claim, dispute or other matter in question has been given, and in no event shall it be made after the date of final acceptance of the Work by the Owner or when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations, whichever shall first occur.

---

[31] In its May 30, 2008 Reply Brief in response to Superior's Brief in Support of Motion to Stay and Compel Arbitration of Claims, 7, Miller & Long points the court to its discussion in its Reply Brief in response to Superior's Memorandum of Law in Opposition to Miller & Long's Motion for Summary Judgment and in Support of Superior's Motion to Dismiss or Stay Plaintiff's Complaint, 8-10.  The court considers those arguments herein.   Miller & Long summarizes its citation by mentioning that its counsel does not have any knowledge that either Superior or Intracoastal have agreed voluntarily to submit their dispute to arbitration.  Pl. Br. Opp. Mot. Stay 7, n. 4.

[26]     Burns stated in his affidavit that the architect, acting on behalf of the Owner, certified that Miller & Long's work on Buildings Two, Three and Four was 100% complete on June 4, 2007.[32]  Burns references two pay applications in support of this statement.[33]  If the architect's certification were a final acceptance, then the demand to arbitrate, made on July 8, 2008, came well after the final date on which it could be made, June 4, 2007.  These pay applications, however, do not indicate that the architect was acting on behalf of Intracoastal and, as such, do not constitute final acceptance of the work by Intracoastal.

<u>Exceptions to Arbitratility</u>

[27]     Article 14.7 of each Subcontract excepts from the agreement to arbitrate any claim:

> asserted by the Subcontractor against the Contractor if the Contractor asserts said claim, either in whole or in part, against the Owner and the contract between the Contractor and Owner does not provide for binding arbitration, or does so provide but the two arbitration proceedings are not consolidated, or the Contractor and Owner have not subsequently agreed to arbitrate said claim . . . .

---

[32] *See* Burns Aff. ¶¶ 5, 8.
[33] *Id.* Exs. B and C.  Burns represents that Exhibit B is a pay application for work performed on Buildings Two and Three.  This pay application references the Preserve Project, not Buildings Two and Three.  Moreover, the Original Contract Sum on this exhibit is not consistent with the $5,825,000 contract sum for Buildings Two and Three previously discussed.  *See* n. 4.  This inconsistency leads the court to conclude this pay application is not in reference to Buildings Two and Three.  While Exhibit C does reference Building Four, the Balance to Finish as of June 1, 2007 was $637,875.89, still a substantial portion of the original contract sum of $6,300,000.  This remaining balance suggests that there remained some substantial work to be completed.

[28]    In a separate action, Superior has asserted related claims against Intracoastal.[34]

[29]    Further, the contract between Superior and Intracoastal provides for binding arbitration.[35]

[30]    On January 13, 2009, Superior withdrew the Motion to Stay Pending Arbitration in its Amended Complaint in *Superior Constr. Corp. v. Intracoastal Living, LLC*, stating it "will not pursue arbitration of this dispute,"[36] though Superior did suggest the possibility of arbitration in its Second Amended Complaint, filed April 28, 2009.[37]

[31]    To the court's knowledge, there is no current arbitration proceeding between Superior and Intracoastal.  Accordingly, there can be no consolidation.

[32]    Moreover, to the court's knowledge, Superior and Intracoastal have not subsequently agreed to arbitrate the related claims.

[33]    Accordingly, the exclusionary provisions of Article 14.7 are satisfied, and notwithstanding any contrary agreements between Miller & Long and Superior, Miller & Long's claims against Superior are not subject to arbitration.

---

[34] The Movants argue that the exceptions of 14.7 do not apply in the present case because Superior has not claimed (a) it is asserting Miller & Long's claim against Intracoastal; (b) Superior's claims against Miller & Long are separate from its claims against Intracoastal and (c) Superior's dispute with Intracoastal does not preclude Superior from enforcing its agreement to arbitrate claims between it and Miller & Long. Rep. Br. Supp. Mot. Stay Comp. Arb., 4.  However, Superior does premise its claims against Intracoastal on the value it contributed to the buildings discussed herein, value contributed by it through its subcontractors.  *See*, *e.g., Superior Constr. Corp. v. Intracoastal Living, LLC, Brunswick County No. 07 CVS 2806 (N.C. Super. Ct.)*, Second Am. Compl. ¶¶ 12-13, 24-25, 27-30, 32, 35-36, 38, 124-25.

[35] Rep. Br. Supp. Mot. Stay Comp. Arb., Ex. B, § 4.6.  The Movants argue such binding arbitration demonstrates that Superior and Intracoastal consented to or agreed to arbitrate their disputes. *Id.* 3-4. The Movants also argue that the general conditions in Superior's contract with Intracoastal require any claim arising out of or relating to the contract to be arbitrated.  *Id.* However, the language of Article 14.7 includes the word "subsequently," which suggests that it is not appropriate to consider previous agreements to arbitrate.

[36] *Superior Constr. Corp. v. Intracoastal Living, LLC*, Withdrawal Mot. Stay Pending Arb.

[37] *Id.*, 2d Am. Compl., ¶¶ 111, 12 (latter on p. 25).

<u>Estoppel</u>

[34]     Miller & Long argues that the Movants should be estopped from asserting different positions on the degree of completion of Building Four and Miller & Long's entitlement to be paid on Buildings Two, Three and Four.  Miller & Long also argues that the Movants should be estopped from asserting different positions on the general arbitrability of Miller & Long's claims on Building Five.  For example, the Motion does not mention Building Five.

[35]     The court determines, however, that the elements required for such estoppel have not been met.

NOW THEREFORE, based upon the foregoing FINDINGS and CONCLUSIONS, it is ORDERED that Superior Construction Corporation and Western Surety Company's Motion to Stay and Compel Arbitration hereby is DENIED.

This the 21st day of June, 2011.